CLARA A. VANBUSKIRK *vs.* WESLEY T. DIAMOND & another.

Berkshire. September 21, 1943. — June 6, 1944.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, RONAN, WILKINS, & SPALDING, JJ.

*Way,* Private: location, extent. *Deed,* Construction.

A deed of land with a right of way "as the same now exists" to a lake "over" a designated lot which lay between the lake at the south and a street at the north and was twenty-five feet wide from east to west, where it appeared from a master's report that at the time of the conveyance there was a dirt road ten feet wide running in a general

southerly direction from the north line of the lot to a second road bisecting it from northeast to southwest, and that there was travel to the lake over the part of the lot south of the second road but no definite road there, did not give the grantee a right of way over the entire width of the lot, but, in accordance with the intention of the parties as found by the master, only over the dirt road on the north part of the lot and over a ten foot strip along the east side of its south part, which was found to be a reasonable location in that part notwithstanding certain obstructions existing in such strip near the shore of the lake.

BILL IN EQUITY, filed in the Superior Court on September 29, 1942.

The suit was referred to a master. It appeared from a plan attached to the master's report that Lot 93 was located on Grove Avenue, which ran southerly, ending at the west end of Katherine Street; that Lot C extended from the south end of Grove Avenue southerly to the north shore of Pontoosuc Lake; that Lots B, 113, A, and 112 were located in that order to the west of Lot C, Lot B being adjacent thereto; and that Lot 104 was located on the west side of Grove Avenue at its south end, and northerly of Lots 113, A, and 112.

Among the master's findings were the following: "Grove Avenue is a narrow dirt road and Narragansett Avenue is a twenty-two foot paved road running diagonally through the upper or northerly part of Lot C." "The upper or northerly part of Lot C shows a dirt road, the continuation of Grove Avenue, about ten feet in width which runs from about the middle of the northerly line of Lot C in a curve to the southeast and slightly to the southwest and into Narragansett Avenue. Katherine Street, so called, on the plans, ends at Grove Avenue and runs easterly to Narragansett Avenue. The road is overgrown with brush and blocked off by a bar, but is distinguishable by a line of white birches on each side. The lower or southerly part of Lot C has no apparent road, path or track crossing it to the lake." "There was uncontradicted testimony that prior to the laying out and construction of Narragansett Avenue in 1934 a narrow dirt road extended from the highway southwesterly across Lot C about ten feet below the

present Narragansett Avenue. . . . This old road was in existence from prior to 1928 to 1934." "There was testi- mony . . . to the effect that before 1929 there was an old dirt road or track running northerly, diagonally across Lots 112, A, Katherine Street and a corner of Lot 104; that in 1929 Mrs. Baglee cut or had cut the brush on the upper or northerly part of Lot C so that passage might be had from Grove Avenue to the old road leading to the highway referred to above and blocked up the old road or track with the brush so cut, and that from then until May 22, 1931, the only use made of the upper or northerly part of Lot C was for passage from Grove Avenue to said old road leading to the highway." "There was uncontradicted evidence that the physical condition of the upper part of Lot C remained the same from 1929 to 1934 when Narra- gansett Avenue was constructed."

The case was heard on the master's report by *Burns,* J.

In this court the case was argued at the bar in September, 1943, before *Field,* C.J., *Donahue, Dolan,* & *Ronan,* JJ., and after the retirement of *Donahue* & *Cox,* JJ., was sub- mitted on briefs to *Lummus, Qua, Wilkins,* & *Spalding,* JJ.

*J. F. Donna,* for the defendants.

*L. S. Cain,* for the plaintiff.

DOLAN, J.   This is a bill in equity brought to have the defendants enjoined from taking any further steps in the construction of a house or a part thereof on any part of a certain parcel of land in Lanesborough, and to compel them to restore the surface of said land to its former condition. The case comes before us upon the defendants' appeal from the decree entered by the judge granting the relief sought by the plaintiff.

The case was referred to a master whose material findings of fact may be summarized as follows: The plaintiff is the owner of lot 93 on a plan of Dunreath Park, in Lanesborough, which was duly recorded. A copy of the plan is incorporated in the record. The defendant Diamond is the owner of lots 113, B and C, as shown on the plan. The land in general that is shown on the plan consists of partially developed land located at or near Pontoosuc Lake and is devoted to small

cottages.  Most of the lots shown on the plan, including those involved in the present case, were at one time owned by one Vreeland.  On July 23, 1927, he conveyed by warranty deeds lots 100 and 101 to one Hunt, together with a "right of way to be used in common with others for the purpose of travel on foot from the streets shown on said plan, extending over and across lot 'C' as shown on said plan to the West [*sic*] [1] shore of Pontoosuc Lake."  On May 12, 1928, he conveyed many of the remaining lots, including those with which we are here concerned, namely, lots 93, 113, B and C, to one Baglee, stating in the warranty deed that lot C was conveyed "subject to right of way heretofore granted over and across the same."  On May 22, 1931, Baglee conveyed lot 93 to the plaintiff, "Together with a right of way as the same now exists over Lot 'C' on said plan, to Pontoosuc Lake."  On May 20, 1933, she conveyed lots 113 and B to persons who subsequently conveyed them to the defendant Diamond.  On June 25, 1942, Baglee conveyed lot C to Diamond "subject to the right of way extending from the highway over and across a portion of same to the west [*sic*] shore of Lake Pontoosuc as the same now exists and inso far [*sic*] as the same may now be in effect."  The defendant Diamond's house is situated on lot B but one corner thereof extends for some fractions of a foot over lot C.  Diamond, hereinafter referred to as the defendant, proposed to build a wing to his house which would extend into a part of lot C.  He employed the defendant Boison to do the work, and at the time that the preliminary injunction in the present suit was granted the cellar for the wing had been dug and part of the cribbing had been put in, but no concrete had been poured.  The proposed wing would extend into lot C easterly for about nine feet six inches or to a point about fifteen feet six inches from the easterly line of lot C.  The lot is about twenty-five feet wide.  Narragansett Avenue, a "twenty-two foot paved road," runs from west to east diagonally through

---

[1] The plans attached to the master's report establish that the shore of Pontoosuc Lake referred to is the north, not the west, shore. — REPORTER.

the defendant's lots 113, B and C and beyond, dividing each of his lots into two portions, one to the north, the other to the south, of the avenue, which was constructed in 1934. The northern line of lot C is on a narrow dirt road called Grove Avenue. The southern boundary of the lot is on the lake. There is a dirt road some ten feet in width on the northerly or upper part of lot C, running from about the middle of the northerly line of the lot in a curve to the southeast and slightly to the southwest into Narragansett Avenue. This road is overgrown but is distinguishable. The master took a view of the premises and in connection therewith found that, at the time of the conveyance of lot 93 to the plaintiff (May 22, 1931), the "only way apparent on the premises was that across the upper part of Lot C to the old road, that said way was a strip approximately ten feet wide leading from Grove Avenue to . . . [the] old road." Near the easterly line of lot C and almost on the shore line of lot C there is a small hummock. To the east of the hummock and about five feet from the easterly line of the lot there is a white birch tree which has been there since 1928. The nearest point of the proposed wing will be between ten and eleven feet distant from that tree. The master stated in his report that there was evidence that from 1927 to May 22, 1931, certain people crossed the lower part of lot C to go to the lake, that "some cars were driven across and parked there," that in crossing the lot no particular track or path was followed, but that there was no evidence to show who the owners of those "cars" were. The master also stated that there was evidence that the defendant's grantors, former owners of lots 113 and B (now owned by the defendant), cut the brush off the lower part of lot C, graded the land and planted grass though they had no right of way across that lot, and that when they were in residence people passing across the lower part of lot C kept to its easterly side. The master also stated that there was evidence that after May 22, 1931, some of those entitled to cross lot C took their boats across its lower part to place them in the lake, sometimes by hand, sometimes by "car"; and he found that the nature of the ground was such that

they must have taken them by the white birch tree which was about ten or eleven feet from the proposed wing.

The master further found that "up until the time of this suit no definite path or road was apparent, existed or was customarily used over the lower part of Lot C." In conclusion he found that it was the intention of the "parties" to create a right of way across lot C to pass and repass from Grove Avenue to the old road and from said old road to Pontoosuc Lake "by foot or by car" for all the usual purposes including the launching and removal of boats, and that such right of way should extend to low water mark. The master also found, if proper for him to do so, that "Since the limits and location of the right of way across the lower part of Lot C were never defined and cannot be determined from the deed or deeds referred to . . . the reasonable and convenient location for such right of way is a strip of land ten feet wide from Narragansett Avenue along the easterly side of said lot to Pontoosuc Lake," and that the way that existed across the upper portion of the lot was substantially the same as now exists and is a reasonable one.

The plaintiff excepted to the conclusions of the master on the ground that they were inconsistent with his subsidiary findings under which, she contended, it would follow that, by reason of the obstructions caused by the hummock and white birch tree near the easterly line of lot C, there would be less than ten feet from that line available in which to launch boats at the shore west of the white birch by "car" from Narragansett Avenue to the lake, and set up that the proper conclusion from the master's subsidiary findings and the documentary evidence was that the plaintiff's right of way extended for the entire width of lot C. The judge entered an interlocutory decree sustaining the plaintiff's exceptions to the report, and confirming the master's report as so modified. Subsequently the judge entered a final decree ordering "1. That the defendants be and hereby are permanently enjoined from constructing any addition or wing to the cottage of the defendant Diamond upon any part of Lot C referred to in the bill of complaint. 2. That the defendants be and hereby are ordered to reinstate the

surface of Lot C to its former condition, to wit: its condition on June 25, 1942, the date on which said Lot C was conveyed to defendant Diamond as referred to in the bill of complaint."

The evidence is not included in the master's report, and it is not stated nor shown therein that his ultimate findings of fact are based solely on the subsidiary facts set forth in the report. This being so, the judge and this court are bound by the ultimate findings unless the subsidiary facts are sufficient in themselves to demonstrate that the ultimate findings could not be justified upon any evidence that the master might have received. *Dodge* v. *Anna Jaques Hospital*, 301 Mass. 431, 435–436. And since the grant here in question is phrased in uncertain and ambiguous language, extrinsic evidence was admissible to aid in its construction. *Blais* v. *Clare*, 207 Mass. 67, 70, 71. *Beals* v. *Brookline*, 245 Mass. 20, 24. See *Atwood* v. *Boston*, 310 Mass. 70, 74–75, and cases cited.

The general finding of the master that the limitations and locations of the right of way over the lower part of lot C were never defined and cannot be determined from the deeds referring thereto is supported by the facts found by the master. All the deeds referred to in the report of the master describe the respective lots conveyed as shown on the duly recorded plan, of which we have already spoken and which became a part of the several deeds. But no right of way over lot C is defined on the plan. The pertinent words in the deed to the plaintiff merely describe the close in, through and over which the plaintiff should have a right but they do not describe the limits of the way granted. This is true with respect to the other deeds referred to in the report of the master. There was no description of the way by metes and bounds in any of the conveyances where the right was granted. This being so, the grants were but of such a right of way within lot C as should be necessary and convenient for the purposes for which it was granted. *Salisbury* v. *Andrews*, 19 Pick. 250, 258. *Atkins* v. *Bordman*, 2 Met. 457, 467. *Dunham* v. *Dodge*, 235 Mass. 367, 371. *Barrett* v. *Duchaine*, 254 Mass. 37, 41. *Rajewski* v. *MacBean*, 273 Mass. 1, 5–6. *Beaudoin* v. *Sinodinos*, 313 Mass. 511, 517–

518, and cases cited. And what the uses are to which the land granted might be conveniently put depends on the various circumstances including what was in the minds of the plaintiff and her grantor when the conveyance was made. *Johnson* v. *Kinnicutt*, 2 Cush. 153, 156–157.

The cases relied upon by the plaintiff do not support her contention that the right of way granted extends through the entire width of lot C. In *Farnsworth* v. *Taylor*, 9 Gray, 162, the street over which the right of way was granted was defined on the plan, and in the other cases cited by the plaintiff the limits of the way were described by exact measurements.

Vreeland, who originally made grants of other lots with provision for the right of way over lot C, in those deeds limited the right to one of passage on foot. Obviously no grantee of such a right could assert more extensive rights over lot C, and just as obviously no such right not described by metes and bounds could confer upon the grantee rights other than to a reasonable and convenient space over the lot by which to pass on foot. It was subject to this limited right that Vreeland conveyed lot 93 (now owned by the plaintiff) and lots 113, B and C (now owned by the defendant) to Baglee, who was subsequently the plaintiff's and the defendant's grantor. In Baglee's deed to the plaintiff dated May 22, 1931, the right of way granted was "as the same now exists over Lot 'C' on said plan, to Pontoosuc Lake," no metes and bounds of the way being set out. The master has found as before stated that prior to the date of that conveyance to the plaintiff some "cars" were driven across the lower part of lot C and parked there, but that there was no evidence as to who the owners of these "cars" were, and that after that date some of those entitled to a right of way across lot C took rowboats across its lower part, sometimes by hand and sometimes by "car." But while the master did not find specifically that, at the time of the conveyance to the plaintiff, a right of way existed over lot C by "car," he did find that before "1929 there was an old dirt road or track running northerly, diagonally across Lots 112, A, Katherine Street and a corner of Lot 104, that in

1929 Mrs. Baglee cut or had cut the brush on the upper or northerly part of Lot C so that passage might be had from Grove Avenue to the old road leading to the highway referred to above and blocked up the old road or track with the brush so cut, and that from then until May 22, 1931, the only use made of the upper or northerly part of Lot C was for passage from Grove Avenue to said old road leading to the highway."

We draw the inference from this finding that the right of way through the upper portion at least of lot C was used prior to the conveyance to the plaintiff not only for passage on foot but also for passage by vehicles. Ordinarily dirt roads are not used exclusively for travel on foot but are just as commonly used for passage by vehicles. It would be unnecessary to have cut the brush on the upper portion of lot C to a width which the master could have found was ten feet, if it was intended that the cleared space should be used for passage on foot only. It is a fair inference that Grove Avenue from which passage was intended to be had over the cleared strip to the old road was used for vehicular traffic as well as for passage on foot at the time of the conveyance to the plaintiff. It would be anomalous if the right of way in question should be for different uses over the same lot. As the owner of the fee in lot C at the time of the conveyance to the plaintiff, Mrs. Baglee could subject the lot to a right of passage by vehicles as well as on foot. In her deed to the plaintiff she conveyed "a right of way as the same now exists over Lot 'C' on said plan, to Pontoosuc Lake." She used the same language in conveyances made at the same time (May 22, 1931) of lots 96, 97, 98, and 99. Substantially the same language was used by Mrs. Baglee in her conveyance to the defendant in 1942, adding "inso far [sic] as the same may now be in effect." We think the finding of the master, that it was the intent of the parties (we assume Mrs. Baglee and the plaintiff) that the right of way granted included a right across lot C from Grove Avenue to the old road and from the old road to Pontoosuc Lake on foot or by "car" for all the usual purposes of the launching and removal of boats, is supported by the subsidiary facts found by him

and the reasonable inferences therefrom. The defendant does not seriously contend that the right of way in question should be limited to one for passage on foot and argues more generally that, if the plaintiff is entitled to passage in any other manner, the master's report should be confirmed and his determination and location of the right of way be accepted.

There is no inconsistency between the findings of the master as to the obstructions in the ten-foot area from the easterly line of lot C, consisting of the hummock and the white birch tree within that area, and his conclusion that that area is a reasonable and convenient location of the right of way. It is to be observed that the master has found that the hummock is near the easterly line of lot C and almost on the shore line of lot C and that the birch tree was to the east of the hummock and about five feet from the said easterly line, and that he also found that the shore line of lot C consisted of a bank from one to three feet in height. It is a fair inference that one passing over the lot to the shore line by automobile could thus proceed unobstructed through the area found by the master to be a reasonable and convenient location over the lower portion of lot C, almost to the shore line or bank. It would seem that that would be a reasonably proper place for one to stop in taking a rowboat by automobile over the area in question, and that one taking a rowboat by hand over the area to the lake would not be impeded by the hummock or the tree. Moreover, as is pointed out by the defendant, the plaintiff with the right of way found by the master may lawfully remove the birch tree and the hummock or other obstructions within the limits of the right of way, and may level and prepare it for use for the purposes for which it has been found the right of way was granted. *Atkins* v. *Bordman,* 2 Met. 457, 467. *Guillet* v. *Livernois,* 297 Mass. 337, 340, and cases cited. The plaintiff addresses no argument to us as to the finding of the master relative to the location of the right of way over the upper portion of lot C, except as she contends generally that the right of way granted by the deed to her of lot 93 is over the whole of lot C by virtue of the reference to the plan show-

ing the metes and bounds of that lot.   We have already disposed of that contention.

It follows from what we have said that the interlocutory decree sustaining the plaintiff's exceptions to the master's report and confirming the report as modified by that action must be reversed, and that instead an interlocutory decree must be entered overruling the plaintiff's exceptions to the report and confirming the same; and that the final decree entered by the judge must be reversed, and that instead a final decree must be entered establishing the plaintiff's right of way over lot C in accordance with the conclusions of the master, with costs in the court below and of this appeal to the defendants.

*Ordered accordingly.*